## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIRST DERIVATIVE TRADERS L.P., BOB PALMER, and GLORIA JAMES-KING, | C.A. No. _____ |
| Plaintiffs | |
| vs. | |
| BAUSCH & LOMB, INC, RONALD L. ZARRELLA, ALAN M. BENNETT, CATHERINE M. BURZIK, DOMENICO DE SOLE, PAUL A. FRIEDMAN, JONATHAN S. LINEN, RUTH R. MCMULLIN, LINDA JOHNSON RICE, WILLIAM H. WALTRIP, BARRY W. WILSON, and KENNETH L. WOLFE, | JURY TRIAL DEMANDED |
| Defendants, | |

## COMPLAINT

## NATURE OF THE ACTION

Plaintiffs, by and through their undersigned attorneys, allege upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through their undersigned counsel), except with respect to their ownership of shares of common stock of defendant Bausch & Lomb ("B&L" or the "Company"), which allegations are based upon personal knowledge, against defendants as follows:

## INTRODUCTION

1.     This action arises out of the Company's August 14, 2007 Definitive Proxy filed on Form DEFM 14A with the Securities and Exchange Commission (the "Proxy") concerning the May 16, 2007, merger agreement (the "Merger Agreement") between defendant B&L and

affiliates of Warburg Pincus, LLC, a global private equity firm ("Warburg"), to take the Company private for $65 cash per share in a transaction valued at approximately $4.5 billion including the assumption of debt (the "Transaction").

2.      Plaintiffs bring this individual action to preliminarily and permanently enjoin a shareholder vote presently scheduled for September 21, 2007, on the Transaction because the Proxy soliciting shareholder approval is false, defective and materially incomplete.

3.      If the Transaction is approved, it will result in the merger of defendants B&L and Warburg and the exchange of the Company's common stock for $65 cash per share.

4.      As described below in greater detail, B&L struggled under the weight of poor management for years.  The Company was mired in two significant accounting scandals and was rocked by an embarrassing recall of its premier lens care solution.  What was once a proud company – with a history spanning over one hundred and fifty years and a role as an indispensable part of western New York's economy – lost its luster.

5.      B&L's recent problems were not superficial.  Its brand-name, once synonymous with quality and innovation, was becoming associated with quality control issues, contaminated products resulting in eye fungal infections, personal injury lawsuits, and securities class action lawsuits.

6.      The Company, however, did not surrender despite the poor stewardship of its chairman and chief executive officer, defendant Ronald L. Zarrella, who admittedly lied on his resume and whose only sanction was that his bonus was delayed.  Its employees, many of them from western New York and members of the Rochester community, remained loyal and worked hard to put the Company back on the path to prosperity.  Indeed, in the wake of the accounting scandals, product recalls, and ethical lapses, the previous few months have seen the Company's

486517

image improve and Wall Street's expectations turn to the positive.

7.      As has been the case in the capital markets for the last three years, sophisticated private equity investors like Warburg recognize and then swiftly act on opportunities to buy companies like B&L on the eve of a revival for rock-bottom prices relative to future earnings. Warburg is such a firm and has been engaged in this business practice for decades.

8.      Warburg is a legendary investor in the health sciences filed.  Its website states it has been a "direct equity investor in healthcare for more than 30 years . . . [and] has invested more than $4 billion in approximately 120 healthcare companies.  The firm takes a long-term perspective and invests in public and private companies at all stages of development.  Even in the face of rapid technological development, changing reimbursement and regulatory environments, shifting investor sentiment and financing cycles, we support management teams that share the firm's common objective of building durable businesses with sustainable value."

9.      Warburg seeks to purchase undervalued assets at a discount at just the right time:

> Warburg Pincus has been an active investor in leveraged buy-out and special situations transactions for many years, having invested approximately $4 billion in such late-stage deals. Most of the firm's focus in this area has been on the acquisition of undervalued companies or those that have developed new technologies to support significant growth initiatives. We maintain a consistent approach to ensure we stay very selective and disciplined in how we select deals. Our activities in this sector are global.

10.     Warburg admittedly supports the target's incumbent management so long as it is willing to create "sustainable value" that will inure to Warburg's financial benefit.

11.     Accordingly, Warburg set its sights on B&L, and B&L was a willing target for many reasons.  Indeed, B&L and defendant Zarrella were predisposed to a Warburg offer from as early as 2006 because any deal with a private equity investor would allow Zarrella to keep his job and shield him from continued shareholder criticism.  A deal with private equity also would

- 3 -

486517

allow Zarrella to enjoy massive termination benefits on the buy-out (even though he will maintain his job) and afford him equity in the Company once it became private. He then will reap substantial returns once Warburg re-floats the Company's stock – something that usually occurs approximately five years after the date the buy-out closes.

12.     Warburg also exploited its pre-existing relationship with one or more of the directors of defendant B&L to make an offer to acquire the Company's outstanding shares at a price that does not fairly compensate the public shareholders for the inherent value of their investments, and timed its offer to coincide with the depressed price for B&L stock.

13.     Significantly, according to the Company's Proxy, plaintiffs do not have appraisal rights in connection with the Transaction, though owners of the Company's Class B stock are afforded such rights. Class B stockholders, however, appear to be members of management and/or directors of the Company. Thus, if the shareholders approve the Transaction, plaintiffs' investment in B&L will be extinguished for inadequate consideration, the Company will be merged with a Warburg subsidiary, and plaintiffs will have no adequate remedy at law for their injuries.

## JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, as the action arises under the laws of the United States.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), as defendant B&L maintains its principal place of business within this judicial district and some or all of the acts or practices complained of herein, including the preparation and creation of a materially false and misleading proxy statement, occurred within this judicial district.

486517

## PARTIES

16.     Plaintiff First Derivative Traders L.P. is, and at all times relevant has been, a shareholder of B&L.

17.     Plaintiff Gloria James-King is, and at all times relevant has been, a shareholder of B&L.

18.     Plaintiff Bob Palmer is, and at all times relevant has been, a shareholder of B&L.

19.     Defendant B&L is an eye health company that describes itself as "dedicated to perfecting vision and enhancing life for consumers around the world." The Company's core products include soft and rigid gas permeable contact lenses and lens care products, and ophthalmic surgical and pharmaceutical products. The Company is incorporated in New York, and maintains its headquarters at One Bausch & Lomb Place, Rochester, NY 14604.

20.     Defendant Ronald L. Zarrella has served as the Company's Chairman and Chief Executive Officer since 2001. Mr. Zarrella is also a Director on the Board of Avaya Inc., a company in which Warburg is a major shareholder. From February 2002 to September 2002, Mr. Zarrella served on the Board of Avaya Inc. with Henry B. Schacht, Managing Director at Warburg, and since January 2003 he has served on that Board alongside Joseph P. Landy, co-President of Warburg. In October 2002 it was discovered that Mr. Zarrella lied on his resume; his only penalty was forfeiture of his incentive bonus for that year.

21.     Defendant Alan M. Bennett has served as a director of the Company since 2004.

22.     Defendant Catherine M. Burzik has served as a director of the Company since January 2007.

23.     Defendant Domenico De Sole has served as director of the Company since 1996. Mr. De Sole is a member of the Special Committee charged with review of the Transaction.

486517

24.     Defendant Paul A. Friedman, M.D. has served as a director of the Company since 2004.

25.     Defendant Jonathan S. Linen has served as a director of the Company since 1996. Mr. Linen also has ties to Warburg.  In particular, he shares a membership on the Council on Foreign Relations with Charles R. Kaye, Co-President of Warburg and Henry B. Schacht, Managing Director of Warburg.  Mr. Linen purports to be an independent director and is a member of the Special Committee charged with review of the Transaction.

26.     Ruth R. McMullin has served as a Director of the Company since 1987.

27.     Linda Johnson Rice has served as a director of the Company since 1990.

28.     William H. Waltrip has served as a director of the Company since 1985.  Mr. Waltrip is Chairman of the Special Committee charged with review of the Transaction.

29.     Barry W. Wilson has been a director of the Company since 2003.

30.     Kenneth L. Wolfe has served as a director of the Company since 1989.

31.     The individual directors of B&L, consisting of defendants Zarrella, Bennett, Burzik, De Sole, Friedman, Linen, McMullin, Rice, Waltrip, Wilson and Wolfe (collectively the "Director Defendants"), owe fiduciary duties including good faith, loyalty, fair dealing, due care, and candor, to B&L and its shareholders.

32.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

33.     Each Director Defendant herein is sued individually as a conspirator, as well as in his/her/its capacity as an officer, director and/or controlling shareholder of the Company, and the

486517

liability of each arises from the fact that each Director Defendant has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

34.     Non-party Warburg has been a leading private equity investor since 1971. The firm currently has approximately $20 billion of assets under management investing from nine offices around the world. Warburg has invested $26 billion in 570 companies in 30 countries and across a range of sectors, including healthcare, consumer and retail, industrial, financial services, energy, real estate and technology, media and telecommunications. The firm maintains headquarters at 466 Lexington Avenue, New York, NY 10017.

## FACTUAL BACKGROUND

35.     Defendants endeavor to sell the Company to Warburg for inadequate consideration, following a flawed process, by means of a materially deficient Proxy that omits material information.

36.     Furthermore, the Director Defendants independently breached their duty owed to the B&L stockholders to take all necessary steps to ensure that the stockholders receive the maximum value realizable for their shares in any transaction constituting a change in corporate control. The failure to maximize stockholder value included the failure to implement a bidding mechanism to foster a fair auction of the Company to the highest bidder or the exploration of strategic alternatives that may return greater or equivalent short-term value to the plaintiffs and the Class. The Director Defendants also independently breached their duty to the B&L stockholders to fully inform them when seeking their votes in favor of the Transaction.

37.     The Director Defendants concealed their wrongdoing by failing to disclose in the Proxy material facts about the Transaction, the process leading to the Merger Agreement, and other facts alleged herein necessary for plaintiffs and the other public shareholders to make an

486517

informed decision whether to vote for or against the Transaction.

*The Company's Spate of Problems Depressed its Stock Price Rendering It Vulnerable to an Unfair and Opportunistic Bid*

38.     As detailed below, the Director Defendants and Warburg are trying to orchestrate the purchase of the Company just as all signs point to a return to profitability and restored credibility.

39.     For example, on May 10, 2007, B&L released fairly positive results.   The Company's free cash flow figure was strong – a metric closely watched by Wall Street analysts. Thus, all signs point to revitalization, including placing its quality control problems squarely into the past.

40.     In addition, the FDA recently announced that B&L's contact lens solution plant that manufactured the Company's Renu with MoistureLoc ("RML") (the solution that was discontinued last year after it was connected to several hundred cases of a rare, but dangerous, eye infection called Fusarium keratitis in parts of Asia and the United States) cleared a rigorous inspection by federal regulators.

41.     The FDA previously inspected the plant last year and found several problems with production, including failure to properly test solutions and check suppliers.  The government also said B&L failed to disclose links between the infection and its product discovered in Asia before the U.S. recall.  The Company is reportedly working hard to resolve these problems.

42.     According to a Company spokesman, some of the corrections made to the plant's processes include putting stainless steel surfaces in the mix room, adding more quality control staff, and installing new air conditioning equipment.

43.     On June 24, 2007, the *New York Times* published a highly critical article attacking defendant Zarrella and addressing his poor management, huge payout, and Warburg's purchase

486517

of the Company "on the cheap":

> And when Bausch's board recently agreed to sell this 154-year-old company to a private equity firm, Warburg Pincus, for $65 a share, it set the stage for Mr. Zarrella to receive a $40 million payout. It gets better: if Mr. Zarrella, 57, stays on and gets an equity stake in a privatized Bausch, he could reap even bigger rewards when the company eventually becomes public again.
>
> Many analysts say they believe that Bausch, based in Rochester, is on the auction block thanks to Mr. Zarrella's poor management, and some large investors complain that the company is being offered up at a price they consider to be a steal. (Many of them have noted that Bausch traded for more than $80 a share just two years ago.) The board has given other buyers until July 5 to make a better offer, but a sharply higher bid is unlikely to emerge, especially given Bausch's weak corporate governance record.

44.    Influential and highly regarded shareholder advisory services like ISS recognize that Mr. Zarrella's "fortuitous" circumstances that are both unseemly and undeserved.   For example, the *New York Times* quotes Patrick McGurn of ISS who offers a colorful but telling description:

> Patrick McGurn, the executive vice president of Institutional Shareholder Services, the corporate governance adviser, says chief executives like Mr. Zarrella have taken gilded exit packages known as golden parachutes and refashioned them into a new breed of payout: the "golden bungee jump." Like its more familiar predecessor, Mr. McGurn explains, the bungee bestows handsome payouts on chief executives when a deal initially goes down, then, as executives spring back toward the public trough at a later date, offers an even more generous reward on the return trip.

45.    The *New York Times* further explains that the need to sell the Company at a  low-ball price is the product of defendant Zarrella's poor stewardship:

> Many analysts say they believe that Bausch, based in Rochester, is on the auction block thanks to Mr. Zarrella's poor management, and some large investors complain that the company is being offered up at a price they consider to be a steal. (Many of them have noted that Bausch traded for more than $80 a share just two years ago.) The board has given other buyers until July 5 to make a

486517

better offer, but a sharply higher bid is unlikely to emerge, especially given Bausch's weak corporate governance record.

46.     Warburg strategically timed its low-ball $65 offer to purchase the Company just as it is emerging from several years of serious problems and as it becomes positioned for improved growth and more competitive margins.

47.     Specifically, B&L's poor stock performance is a function of the controversies dogging the Company.  From 2004 through 2006, the Company's earnings slid nearly 90% under the weight of an accounting scandal at foreign subsidiaries, an embarrassing recall of its flagship lens solution, personal injury litigation arising out of product defects, and class action litigation.

48.     For example, on December 22, 2005, the Company disclosed the details surrounding an internal investigation related to its Brazil subsidiary and announced that it would have to restate its financial results for 2000 through the first half of 2005.  The press release issued by the Company in connection therewith also stated that years of financial statements contained in SEC filing were no longer reliable, including the 2004 10-K and several quarterly reports.  Thus, stockholders were left in the dark about the Company's prospects and results for an extended period of time.  As detailed below, however, Warburg has enjoyed unfettered access to the Company's internal workings since August 2006 - when B&L invited Warburg to commence due diligence and prepare to buy the Company.

49.     The Company's problems also extended to its controls over financial reporting relating to the detection and prevention of fraudulent overrides of tax reporting controls at the Brazilian subsidiary.   B&L further announced that its audit committee commenced an independent investigation into revenue recognition practices in its Korean subsidiary.

50.     These revelations of accounting malfeasance resulted in a precipitous decline in the Company's stock price and were the predicate for a series of securities fraud class actions

that were ultimately transferred to the United States District Court for the Western District of New York.

51.     The Company is also suffering under the weight of an embarrassing product recall on top of accounting issues and restatements.

52.     In April 2006, reports surfaced that the Company's flagship contact lens solution RML was associated with fungal eye infections in some users and the Company would halt shipments though not necessarily sales of product already on shelves.

53.     However, on May 16, 2006, the Company stated that it *would* halt worldwide sales of RML because tests indicated that consumers might be at risk for a potentially blinding fungal infection and the problems were more prevalent than the Company previously disclosed.

54.     Reports soon surfaced that the Company waited 30 days before notifying the FDA that dangerous fungal infections were reported by RML consumers in Singapore.

55.     A June 24, 2007, *New York Times* article noted that the Company's lethargic response to its RML debacle incited the wrath of the FDA:

> To make matters worse, the Food and Drug Administration sharply and publicly criticized Bausch in a warning letter last October for not alerting health officials more quickly about the Singapore outbreak and for numerous manufacturing deficiencies at the plant where Bausch produced ReNu With MoistureLoc -- criticism that product liability lawyers are already promoting on the Web and are sure to cite when their cases go to court.

56.     Early estimates pegged the costs associated with the recall at approximately $50 to $70 million, with a loss in sales approaching $100 million.  These costs do not include the massive liability the Company faces from actions commenced by consumers who suffered serious, permanent damage to their vision as a result of using contaminated RML.

57.     The following chart is instructive:



*The Company's Depressed Stock Price is Also a Function of Poor Management*

58.     In addition to a spate of accounting and quality control issues that have depressed the Company's stock price, analysts and other commentators believe that poor management and inadequate corporate governance further damped down the Company's stock's performance.

59.     Defendant Zarrella has become a lighting rod for criticism.  In addition to his extremely lucrative pay package, in exchange for poor results, he is widely ridiculed for falsely claiming to have earned an M.B.A. on his resume.  He is also faulted for pushing the Company into poorly performing business areas.

60.     Defendant Zarrella and his closest lieutenants, nevertheless, profited handsomely. By mid-2005, they collectively unloaded at least $25 million in Company stock.  (Zarrella alone

486517

sold $4 million with the Company's stock at around $80 per share.)  Only a few months later, the

accounting and RML scandals became public.  The B&L stock never fully recovered, and only

partially recovered due to rumors of a private equity bid.

61.     The June 24, 2007 *New York Times* article noted that the defendants' massive and

lucrative stock sales came at an opportune time:

> By mid-2005, the shares were back above $80, and management
> decided to lock in some gains. In the second and third quarter of
> 2005, Bausch managers unloaded $25 million worth of stock, with
> Mr. Zarrella alone cashing out shares worth nearly $4 million. At
> the time the sales occurred, Bausch shares had just hit a record
> high. "It was rather fortuitous for them," deadpans Mark A.
> LoPresti.

62.     In addition to the forgoing, defendant Zarrella has been heavily criticized for his

lack of candor and communication with investors, especially Wall Street analysts.  For example,

the Company withdrew prior financial statements and stated that they were no longer reliable.

Zarrella, however, would not even convene an analysts' conference call to respond to the most

rudimentary questions.   Furthermore, he refused to speak to influential analysts like Bank

America's David Maris because Mr. Maris asks pointed questions and openly expressed dismay

over the dearth of information provided by the Company concerning its financial posture.

63.     Again, the *New York Times* related the circumstances in a telling manner:

> Although he was a veteran executive, Mr. Zarrella could be thin-
> skinned about criticism from Wall Street. After penning several
> negative reports on the stock, David Maris, then a Bank of
> America analyst, was told that he was no longer welcome at
> Bausch headquarters and could not bring clients to visit. "The
> investor relations person told me, 'I don't like you, Ron doesn't like
> you, and we may never like you,' " he says.

> Once the accounting problems began, management retreated
> further into the bunker. Mr. McCormack notes that his office is
> less than five miles from Bausch headquarters but says he was
> unable to talk to even "one member of the management team."
> "They wouldn't make it happen," he added. Bausch officials say

they had to maintain radio silence with analysts and money
managers because they were constrained by the accounting inquiry
and a lack of timely securities filings. Mr. McCormack said he
finds that explanation wanting. "I told their investor relations guy:
'I'm not looking for financial information. I just want some
guidance on how you're going to get out of this abyss that you've
created.'" Bausch remains mute today -- the company has not held
a conference call with investors in more than a year.

64.    Defendant Zarrella's activities on both the eve of executing the merger agreement

and during the negotiation with Warburg are equally disconcerting. According to the *New York

Times*, Zarrella updated his employment contract, and he increased his bonus from 100 percent to

150 percent of his base salary just a few weeks before the Transaction was unveiled.

*The Company's Financial Position is Improving*

65.    After numerous fiscal quarters where the Company reported bad news

(restatements, recalls, and doctored resumes), on May 10, 2007, the Company reported

preliminary and unaudited results for 1Q 2007.

66.    The reported earnings reflected strength in core areas. In particular, net sales

increased 6% year over year to $579 million. Sales in the contact lens business segment also

improved 7% year over year.

67.    The positive results prompted Credit Suisse analyst Marc Goldman to increase his

2007 earnings per share estimate to $1.92 from $1.89. Baird analyst Jeff D. Johnson wrote that

1Q results suggested sales of "$579 million (up 6%) . . . [versus] . . . $560 million." Baird

further predicted that "full-year 2007 guidance suggest profitability could recover sooner/to

greater extent than we expected."

68.    Furthermore, as reported in *The Wall Street Journal*, "Bausch & Lomb is in the

midst of recovering after voluntarily pulled [sic] its key Moisture-Loc contact lens solution from

U.S. markets in April 2006 and exacted a worldwide recall a month later. The company has said

- 14 -

486517

that the solution itself is safe, but that improper usage could compromise its fungus-fighting ability."

69.     In short, Warburg is buying B&L after its myriad accounting and product-related shortcomings have been disclosed to the market.   Defendants timed the Transaction to take advantage of the Company's improving performance.

70.     As reported on *Bloomberg.com*: "The Transaction comes a week after Bausch & Lomb reported that its first-quarter net income surged 62 percent as its steroid eye drops for treating inflamed eyes, ocular vitamins and Retiser drug delivery implants led an increase in sales."

71.     Jeff Johnson, an analyst at Robert W. Baird & Co. in Milwaukee stated "There's a lot of value in the brand name Bausch & Lomb . . . You're already seeing some recovery in a number of their product lines."

72.     Major stockholders also believe that the $65 price is too low in light of the Company's prospects.  Again, as related by the *New York Times,* large stockholders believe that fairly minor adjustments to the Company's business could translate into significantly higher equity valuations:

> Despite having troubled operations and a damaged brand, Bausch still managed to attract interested buyers -- like Warburg Pincus, for example. And some money managers say the managerial lapses at Bausch have obscured how easy it might be to lift the company's anemic multiples into healthier territory.
>
> Thomas Sandell, whose hedge fund that bears his name has $12 billion under management and owns approximately 4 percent of Bausch, says his calculations show that even a conservative, five-percentage-point increase in margins and divestitures of lines like pharmaceuticals and surgical tools would value the company at least $10 a share higher than Warburg's offer.
>
> "The cost structure is bloated and it seems to be really poorly managed," Mr. Sandell says. "Even if they can get margins to one-

486517

third of where Alcon is, we get to at least $75 a share. Right now,
Warburg is getting a very good deal."

If the Transaction is consummated, Warburg will obtain a
continuing interest in the Company's business going forward,
thereby taking advantage of B&L's future growth and capture such
value for themselves to the detriment of B&L's public
shareholders at a wholly inadequate price.

*The Merger Agreement and Transaction*

73.    On Wednesday, May 16, 2007, B&L announced that it executed a definitive

merger agreement with affiliates of Warburg to effect a "go-private" transaction valued at

approximately $4.5 billion, including the assumption of debt valued at $830 million. Pursuant to

the Transaction, affiliates of Warburg will acquire all of the outstanding shares of B&L common

stock for $65 per share in cash and stockholders will no longer have a continuing interest in the

Company.

74.    The press release stated that B&L's Board of Directors followed the

recommendation of a Special Committee (purportedly composed entirely of independent

directors) and unanimously approved the Transaction. The Transaction is subject to certain

customary closing conditions, including the approval of B&L's shareholders and regulatory

approvals.

75.    The Merger Agreement executed in connection with the Transaction states that

B&L could solicit superior proposals from third parties during the 50 calendar days commencing

on the day of execution. B&L must pay Warburg a $40 million break-up fee if B&L receives a

superior proposal during this so-called "go-shop" period that results in the execution of a

definitive transaction. In short, any subsequent bidder would have to exceed the $65 per share

offer and pay an additional $40 million to Warburg in order to the buy the Company.

76.    B&L purportedly solicited superior proposals during this period, but announced

486517

that it did "not intend to disclose developments with respect to this solicitation process unless and until its Board of Directors has made a decision regarding any alternative proposals."

77.    Immediately following the announcement of the Transaction, B&L shares jumped to $67.65, and traded at a material premium to the Transaction's consideration of $65 per share. This evidenced that sophisticated investors and analysts believed that Warburg's $65 offer was inadequate.

78.    On June 20, 2007, Advanced Medical Optics, Inc. ("AMO") submitted a formal proposal to acquire B&L for $72 per share in stock and cash. On June 29, 2007, AMO submitted a revised bid to acquire B&L for $75 per share, consisting of $45 in cash and $30 in AMO stock. The $75 offer was conditioned, among other things, on the following: (i) approval by both AMO's and the Company's stockholders; (ii) regulatory approvals; and (iii) certain additional due diligence by AMO.   The AMO proposal included: (i) a proposed $130 million reverse termination fee payable by AMO to the Company in the event the transaction does not close due to the failure to obtain requisite financing or antitrust clearance; (ii) proposed reimbursement by AMO of the Company's expenses up to $35 million if AMO failed to obtain the approval of its shareholders; (iii) a proposed $130 million termination fee payable under certain circumstances by the Company to AMO in the event of termination of an agreement with AMO in connection with the exercise by the Board of Directors of the Company of its fiduciary duties; and (iv) a proposed reimbursement of AMO's expenses up to $35 million under the same circumstances in which such expenses are reimbursable under the Transaction.

79.    AMO and B&L's Special Committee engaged in a dialogue concerning AMO's offer via several letters filed with the SEC. On July 31, 2007, AMO asked B&L to: (i) allow AMO several weeks to provide B&L with its assurances that a significant percentage of AMO

486517

stockholders would support the AMO proposal; (ii) grant AMO a waiver concerning the right to disclose non-public information regarding the combined entities to AMO's shareholders; and (iii) provide assurances that B&L is committed to engage in concurrent negotiations towards a definitive merger agreement with AMO.

80.     Unfortunately for B&L shareholders, B&L would not grant AMO's requests.  In fact, AMO's August 1, 2007 letter detailed B&L's preference to sell itself only to Warburg:

> Bausch & Lomb Board has concluded not to grant adequate time for us to seek to provide you with the information you requested in a manner that would be meaningful. It is clear from the way Special Committee has run the go-shop process and the unrealistic hurdles that have been uniquely imposed on Advanced Medical Optics, Inc. ("AMO") that you do not have any interest in providing your shareholders with the opportunity to receive the $75 per share offer that we have proposed. Instead, you remain intent on delivering Bausch & Lomb to Warburg Pincus at $65 per share . . .

81.     Having been stonewalled and unfairly treated, AMO ultimately withdrew its offer and issued the following remarkably blunt and public criticism: "If, in the future, you decide to run a process that is designed to deliver value to your shareholders, please let us know."

### *The Definitive Proxy Is False and Misleading and Omits Material Information*

82.     Defendants filed the Proxy with the SEC on August 14, 2007 and it evidences that B&L was only interested in completing a transaction with Warburg and that no other suitors were given a fair opportunity to bid for the Company.

83.     The Proxy reveals that in 2006, Zarrella "had received several calls from private equity firm concerning the possibility of a private equity investment in the Company, but he did not engage in discussions with these firms."  However, upon being approached by a senior executive of Warburg in August 2006, defendants authorized Warburg to commence due diligence and to submit a proposal to purchase the Company.

486517

84.     Warburg was granted access to the Company's internal financials at a time when no-one, not even B&L's shareholders, had the opportunity to evaluate the Company due to the delayed filing of B&L's quarterly and yearly financial statements and self imposed "radio silence."

85.     In October 2006, AMO submitted a written proposal to purchase B&L at a purchase price "in excess of $60 per share." This offer, however, was quickly turned away by B&L who was determined to wait for Warburg to submit its proposal before reviewing any other offers.

86.     On January 30, 2007, after the Company had announced further delays in its quarterly and yearly financial filings, B&L's Board of Directors nevertheless agreed to expand Warburg's access into the Company's operations. That same day, the Special Committee was created in order to evaluate Warburg's future proposal.

87.     The Special Committee, which purports to be independent, counts among its members at least one director, Mr. Linen, with ties to Warburg.

88.     For the next several months, while other potential suitors were kept at bay, the Special Committee and Warburg negotiated a sale price for the Company. The final accord, which was revealed on May 16, 2007, agreed the Company was to be sold to Warburg for $65 per-share cash.

89.     In addition to capping the price of the Company at $65 per share, defendants burdened the Company with a $40 million break-up fee in the event that B&L accepted a higher offer during the go-shop period.

90.     In addition to its failing to disclose the Director Defendants' preference for executing a deal with Warburg to the exclusion of other bidders, the Proxy omits other material

486517

information that stockholders must be afforded prior to the vote including, without limitation, the following:

a.      The Proxy does not disclose the name of the Warburg representative who approached defendant Zarrella concerning a possible transaction or other strategic arrangement and whether that person and Zarrella serve on any other boards together.

b.      The Proxy does not disclose that defendant Jonathan Linen, a member of the Special Committee, serves on the board of directors of Yum! Brands, Inc., with David W. Dorman, a Warburg senior advisor, and that defendant Zarrella serves on the board of trustees of the Committee for Economic Development with W. Bowman Cutter, Warburg's Managing Director

c.      The Proxy does not disclose the extent of the business relationships between and among B&L, Warburg, and Morgan Stanley & Co. Incorporated ("Morgan Stanley") that might compromise Morgan Stanley's independence as an advisor to the B&L Special Committee in connection with the Transaction. Specifically, the Proxy does not disclose that Morgan Stanley has served as an adviser to Warburg in a number of large transactions, including Warburg's $625 million investment in Marshall & Ilsley and Warburg's $175 million investment in Titan Petrochemicals Group Limited this past year.

d.      The Proxy does not disclose that when Warburg performed its analysis of the Company in or around July 2006, it was performing due diligence for itself as a "buyer" as well as assessing the feasibility of an unrelated third party financial buyer making an offer for the Company.

486517

e.     The Proxy does not disclose whether the August 25, 2006, confidentiality agreement contemplated that Warburg was a possible buyer and an advisor assessing the Company's attractiveness to other financial buyers.

f.     The Proxy does not disclose whether the Board was consulted, involved, or updated at any time since September 2006 when the Company decided to limit the study group to a discreet number of people.

g.     According to the Proxy, AMO sent a letter to B&L in October 2006 expressing interest in exploring a strategic combination.  The overture, however, reportedly was rejected in part because the Board wanted to afford Warburg ample opportunity to finish its review of the Company.  The Proxy does not disclose whether the Board went back to AMO after Warburg completed its review and advised AMO that Warburg was prepared to make a proposal to buy the Company or invited AMO to submit its own proposal to buy the Company.

h.     The Proxy does not disclose whether Morgan Stanley is providing staple financing for the Transaction.

i.     The Proxy does not disclose the process leading to Morgan Stanley's retention as a financial advisor as well as the nature and amount of Morgan Stanley's fee agreement.  This is of particular importance because the Proxy notes that Morgan Stanley and certain of its employees, including those advising the Special Committee with respect to the present transaction, may have committed investment funds in Warburg.

j.     The Proxy does not disclose whether Warburg played any role in finalizing the Company's delayed 2005 Form 10-K or the 2006 Form 10-K.

k.     The Proxy does not disclose the differences in assumptions used by Warburg that affected its valuations and necessitated a meeting of the principals to the

Transaction discuss how Warburg's valuations varied from those performed by members of management or its advisors.

l.     The Proxy does not disclose sufficient details concerning other strategic or financial buyers who expressed interest in acquiring B&L or the nature and extent of communications with such potential buyers.

m.     The Proxy does not disclose the May 8, 2007, results concerning the theoretical valuations for the Company as an independent stand-alone enterprise.

n.     The Proxy does not disclose the approximate percentage of AMO stockholders that B&L contacted concerning whether they supported the AMO proposal.

o.     The Proxy does not disclose why Class B stockholders have appraisal rights given that the rights are unavailable to the Company's common stockholders.

p.     The Proxy fails to disclose the reasons why Morgan Stanley based its valuation on a weighted average cost of capital of 9%.

q.     The Proxy fails to sufficiently explicate the basis for the valuation of the Company.

r.     The Proxy fails to detail sufficient information concerning Morgan Stanley's precedent transaction analysis.

s.     The Proxy fails to disclose whether management revised any of its forecasts or whether Morgan Stanley revised any of its valuation analysis for the Transaction since July 3, 2007.

t.     The Proxy fails to disclose the date on which the Company completed its Second Quarter 2007 financials and whether Morgan Stanley was provided a copy

486517

of the financials and, if so, whether Morgan Stanley revised its valuation premised on those figures.

**COUNT I**
**VIOLATION OF § 14(a) OF THE EXCHANGE ACT,**
**15 USC § 78n(a) AND RULE 14a-9, 17 CFR § 240-14a-9**

91.     This claim is asserted against all defendants.   Plaintiffs repeat and reallege paragraphs 1 through 90 herein.

92.     In a proxy statement, the defendants are obligated to provide shareholders with all material information relevant to the proposed transaction to allow an informed decision by shareholders.

93.     The Proxy described herein is a proxy solicitation within the meaning of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

94.     The Company is the issuer of the Proxy and the Director Defendants ordered the issuance of the Proxy.   Each had a duty pursuant to federal law to disclose all material and relevant information in the Proxy and assure themselves that the Proxy is accurate and complete.

95.     Defendants, however, have violated their obligations of full and accurate disclosure in authorizing the Proxy to be filed with the SEC and disseminated to plaintiffs and the Company's other shareholders despite misrepresenting material facts and omitting other material information necessary to be disclosed in order for shareholders to make an informed decision concerning the proposed Transaction as alleged above.

96.     The Proxy is intended to be relied on by shareholders to form the basis of the decision they make with regard to the Transaction.

97.     The defendants knew or should have known of the misrepresentations and omissions alleged above.   Material information was concealed from shareholders such that

486517

shareholders would be more likely to vote in favor of the Transaction. The non-disclosures render the Proxy materially false and misleading because it fails to provide shareholders with all information necessary to make an informed decision about the Transaction.

98.    The defendants had at their disposal and within their control all of the information necessary to make a full and complete disclosure.

99.    By failing to make accurate and complete disclosure the defendants have made it impossible for the plaintiffs and other shareholders to adequately analyze the Transaction.

100.    As a direct and proximate result of the defendants' breach of duty, plaintiffs are entitled to injunctive relief. Unless enjoined, plaintiffs and the Company's other public shareholders will be required to vote on the Transaction without the benefit of complete and accurate information.

101.    These actions will result in irreparable harm to plaintiffs and the other public shareholders of B&L.

102.    If the Proxy is not corrected and the shareholder vote presently scheduled for September 21, 2007, is not enjoined, plaintiffs and the Company's other public shareholders will lose the valuable B&L shares for inadequate consideration.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment against the defendants, jointly, severally, or individually in the alternative, as follows:

A.    an order declaring the acts and practices of defendants alleged herein unlawful;

B.    an order preliminarily and permanently enjoining the solicitation of proxies in favor of the Transaction pursuant to the materially false and misleading Proxy;

486517

C.      an award of damages necessary to compensate plaintiffs and the other members of the Class in the event the Transaction is approved pursuant to the materially false and misleading Proxy; and

D.      such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: August 21, 2007

**BLITMAN & KING LLP**

Jules L. Smith
Daniel E. Kornfeld
The Powers Building
Suite 207
16 West Main Street
Rochester, NY 14614
Phone: (585) 232-5600
Fax: (585) 232-7738

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Gregory Mark Nespole
Mark C. Rifkin
Matthew M. Guiney
Martin Restituyo
270 Madison Avenue
New York, NY 10016
Phone: (212) 545-4600
Fax: (212) 545-4653

**HARWOOD FEFFER LLP**
Robert I. Harwood
Samuel K. Rosen
488 Madison Avenue
New York, NY 10022
Phone: (212) 935-7400
Fax: (212) 753-3630

486517

**SQUITIERI & FEARON, LLP**
Lee Squitieri
32 East 57th Street, 12th Floor
New York, NY 10022
Phone: (212) 421-6492
Fax: (212) 421-6553

**THE WEISER LAW FIRM, P.C.**
Patricia C. Weiser
Debra S. Goodman
Sandra G. Smith
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Phone:  (610) 225-2677
Fax: (610) 225-2678

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Ave
Suite 202
Bala Cynwyd, PA 19004
Phone: (610) 660-8000

*Attorneys for Plaintiffs*

486517